**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **OFFICE OF FOREIGN ASSETS CONTROL, UNITED STATES DEPARTMENT OF THE TREASURY**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**VOICES IN THE WILDERNESS,**<br><br>**Defendant.** | **Civil Action No. 03-1356 (JDB)** |

**MEMORANDUM OPINION**

Plaintiff Office of Foreign Assets Control ("OFAC" or the "Agency"), a division of the United States Department of the Treasury, brings this action to enforce a $20,000 civil penalty levied against defendant Voices in the Wilderness ("Voices") pursuant to Executive Order 12724 and the Iraqi Sanctions Regulations, 31 C.F.R. § 575, issued thereunder. Voices does not dispute that it exported medical supplies to Iraq without first obtaining the required license. Instead, Voices contends that OFAC acted contrary to law when it delayed issuance of a final penalty notice until nearly four years after issuance of a pre-penalty notice, and only a week after an anti-war protest organized by defendant. On this basis, Voices argues that the penalty is invalid and should not be enforced.

On August 9, 2004, this Court issued a Memorandum Opinion and Order that dismissed Voices' several counterclaims, but also denied OFAC's motion for judgment on the pleadings, and invited Voices to amend its answer to state a claim under the Administrative Procedure Act ("APA”), 5 U.S.C. § 706. The Court also ordered OFAC to provide any documentation with

regard to the timing of the penalty notice. Voices has since amended its pleadings to allege that OFAC acted in violation of the APA, while OFAC has submitted a declaration explaining the reasons for the four-year delay, as well as the administrative record in the case. OFAC has now filed a renewed motion for judgment on the pleadings and to dismiss the amended counterclaim. For the reasons explained below, OFAC's motion is granted in full, and judgment is entered in its favor as a matter of law.

## BACKGROUND

### I. Regulatory Background

Pursuant to the International Emergency Economic Powers Act, the National Emergencies Act and the United Nations Participation Act, the President on August 9, 1990, ordered United States participation in the United Nations' trade embargo of Iraq. Exec. Order No. 12724, 55 Fed. Reg. 33089 (Aug. 9, 1990). To implement that order, OFAC issued regulations providing for the investigation of, and assessment of penalties upon, violators of the embargo. See 31 C.F.R. § 575 et seq. These regulations (known as the Iraqi Sanctions Regulations) state that

> no goods . . . may be exported from the United States . . . to Iraq, to any entity owned or controlled by the Government of Iraq, or to any entity operated from Iraq, except donated foodstuffs in humanitarian circumstances, and donated supplies intended strictly for medical purposes, the exportation of which has been specifically licensed pursuant to §§ 575.507, 575.517 or 575.518.

Id. § 575.205. Anyone who exports goods to Iraq without first obtaining the necessary license is subject to a civil penalty not to exceed $325,000 per violation. Id. § 575.205(a)(1)-(2).[1]

---

[1] OFAC issued a series of general licenses in the months following the United States' invasion of Iraq in 2003, resulting in the lifting of many of the earlier prohibitions on export. But those licenses did not have retroactive effect. See id. § 575.501(a); 68 Fed. Reg. 28,753, 28,755-56 (May 27, 2003); Id. at 11,741, 11,743-45 (Mar. 12, 2003).

The regulations provide that when the Director of OFAC (the "Director") has "reasonable cause to believe that" a violation of the regulations has occurred, and determines that further proceedings are warranted, he may issue a pre-penalty notice to the suspected violator. Id. § 575.502(a). This notice details the legal and factual underpinnings of the alleged violation, and informs the recipient that he has thirty days to submit a presentation to OFAC explaining why the proposed penalty should be lessened or not imposed at all. Id. § 575.502(b). The regulations provide that "[i]f, after considering any presentations made in response to the prepenalty notice, the Director determines that there was a violation by the person named in the prepenalty notice, he promptly shall issue a written notice of the imposition of the monetary penalty to that person." Id. § 575.704.

After the Director provides written notice of a monetary penalty, the violator may choose whether to pay the penalty or request a hearing before an administrative law judge. Id. § 501.703(a)(3). If the violator opts for a hearing, the Director chooses whether to discontinue the penalty action or refer the matter to an administrative law judge. Id. § 501.703(a)(4). Once it is determined with finality that the violator is liable for a monetary penalty -- either through the violator's failure to request a hearing following an adverse determination by the Director, or upon entry of an adverse judgment by an administrative law judge -- and the violator fails to pay the fine or make payment arrangements, the matter is referred to the Department of Justice to file a civil action to recover the unpaid penalty. Id. § 575.705.

**II. Factual Background**

OFAC is an agency within the Department of the Treasury that administers and enforces economic sanctions and trade embargos against foreign entities. Voices in the Wilderness is an unincorporated association headquartered in Chicago that was formed to "challenge the economic

warfare being waged by the [United States] against the people of Iraq." Voices in the Wilderness: 9 Years, at http://vitw.org/archives/806 (visited Jul. 18, 2005).

In January 1996, the Department of Justice forwarded to OFAC several letters it had received from Voices stating the group's intention to violate the Iraqi Sanctions Regulations by sending its members to Iraq to deliver medical supplies without obtaining a license from OFAC. Compl. ¶¶ 12-13. Upon receiving the letters, OFAC sent warnings to several of Voices' members that described the prohibitions in the regulations and the application process for obtaining the necessary license to export humanitarian supplies to Iraq. Id. ¶ 13. Voices responded with more letters detailing unlicensed travel and aid shipments to Iraq that its members had already undertaken. Id. OFAC next received a report from the U.S. Customs Service in December 1997, informing the Agency of an investigation into a 1996 visit to Iraq by one Voices member and a 1997 trip by three Voices members. Decl. of R. Richard Newcomb ("Newcomb Decl.") ¶ 18. Then, in late 1998, OFAC discovered through media sources that Voices as a group had exported relief supplies to Iraq in July and September of 1998, again without obtaining a license. Id. ¶ 20.

On December 3, 1998, the Civil Penalties Division of OFAC issued a pre-penalty notice to Voices for its exports of relief supplies during 1998, and to four individual Voices members for travelling to Iraq in 1997 to deliver medical supplies. Newcomb Decl. ¶ 21; Pl. Mot. at 10. Voices and the four individuals promptly filed responsive presentations with OFAC in which they admitted that they exported the goods to Iraq in violation of the Iraqi Sanctions Regulations. Def.'s Ans. & Countercl. at 5.

Nearly four years later, on October 26, 2002, Voices participated in a protest in Washington, D.C. against United States military policy in Iraq and organized a demonstration

outside the U.N. Headquarters in Baghdad. Def. Am. Answer & Countercl. at 19-20. Just nine days after that, on November 4, 2002, OFAC issued a penalty notice to Voices for two 1998 violations, levying a $10,000 penalty per violation for a total fine of $20,000 (OFAC avers that it fined Voices only for the 1998 violations because the dates of the earlier violations were uncertain and left them susceptible to statute of limitations defenses). Pl. Mot. at 11. Voices responded to the penalty notice in a letter dated December 5, 2002, in which it again admitted that it had violated the sanctions regulations, and stated its intent not to pay the fine. Id. OFAC then referred the matter to the Department of Justice for civil enforcement of the penalty. Id.

The Department of Justice commenced this enforcement action against Voices in the Wilderness on June 20, 2003. On September 26, 2003, Voices filed an answer in which it argued that the regulations were invalid and that OFAC was motivated by a desire to retaliate against Voices for its protest activity. It also lodged a counterclaim for monetary damages and injunctive relief, alleging that enforcement of a civil penalty for shipping humanitarian aid was outside of OFAC's lawful authority, and that OFAC had selectively prosecuted Voices in retaliation for the group's anti-war protests. On November 25, 2003, OFAC filed a motion for judgment on the pleadings and to dismiss Voices' counterclaims. The Court heard arguments from the parties at a June 4, 2004 hearing.

On August 9, 2004, this Court issued a Memorandum Opinion and Order granting OFAC's motion to dismiss Voices' counterclaims and rejecting Voices' defenses, but denying OFAC's Motion for Judgment on the Pleadings. The Court rejected Voices' various claims that the fine was unlawful because it was outside of OFAC's regulatory authority, it violated international law, and it amounted to malicious and selective prosecution. See Office of Foreign

Assets Control v. Voices in the Wilderness, 329 F. Supp. 2d 71, 76-78, 81-83 (D.D.C. 2004). The Court also rejected Voices' contention that OFAC could not enforce the penalty because it did not act "promptly" to issue a written notice of the penalty under section 575.704 of the regulations, explaining that the regulations neither "expressly require OFAC to act within a particular time period" nor "specify any consequences in the event that OFAC fails to act promptly," and therefore OFAC is not divested of jurisdiction to bring an enforcement action even when it has been less than prompt in issuing a penalty notice. See id. at 79-80. However, the Court granted Voices leave to amend its pleadings to "address whether its failure to issue a penalty more promptly, or its decision to issue a penalty notice so immediately after Voices's protest activites, violated the APA." Id. at 80. The Court also ordered OFAC to provide an explanation for the timing of the final penalty notice, along with any relevant documents pertaining thereto. Id.

Voices filed an amended answer and counterclaim on September 15, 2004, which included APA challenges[2] to the timing and motivation of the final penalty notice. OFAC filed a renewed motion for judgment on the pleadings and to dismiss counterclaims on October 4, 2004. OFAC also submitted a declaration by former Director R. Richard Newcomb, explaining in detail the procedural history of this case, and offering an explanation for the time gap between issuance of the pre-penalty and final penalty notices. The declaration disputed that there was any relationship between the issuance of the final penalty notice and the protest actions by Voices

---

[2] Voices asserts a defense rather than a claim under the APA. Although the Court is doubtful that a claim under the APA can be stated as a defense, the issue is of little moment here, because a defense under the APA and a claim under the APA both would seek the same relief in the setting of this case -- preventing enforcement of the penalty that OFAC seeks to enforce.

nine days earlier. Voices filed an opposition to OFAC's motion in which it requested discovery, and OFAC filed a reply in further support of its motion.

This Court heard arguments on OFAC's renewed motion on July 6, 2005. The Court declined Voices' request for discovery, but ordered OFAC to produce the entire documentary record reflecting its consideration of this matter, including any internal communications relevant to the surviving issue in the case (i.e., the APA challenge). OFAC produced the record on July 19, 2005. The record includes the pre-penalty notice issued to Voices, the response filed thereto and the final penalty notice, along with miscellaneous correspondence and logistical documents regarding the case.

## STANDARD OF REVIEW

Under section 706 of the APA, a court reviewing the action of an agency "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A). The court should abide by the agency's factual findings if they are "supported by substantial evidence" and affirm the agency's orders so long as there is a rational connection between the facts found and the choice made. See Midwest ISO Transmission Owners v. FERC, 373 F.3d 1361, 1368 (D.C. Cir. 2004). The agency's decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." Id. at 416; see Bagdonas v. Dep't of Treasury, 93 F.3d 422, 425 (D.C. Cir. 1996)

(the "standard of review[ ] established by the Administrative Procedure Act[ ] is a narrow, highly deferential one").

The APA's scope of review provisions are cumulative, and section 706(2)(A) -- concerning conduct that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" -- is "a catchall, picking up administrative conduct not covered by other more specific paragraphs." Assoc. of Data Processing Serv. Orgs. v. Bd. of Governors of the Fed. Reserve Sys., 745 F.2d 677, 683 (D.C. Cir. 1984). In evaluating agency action under the "arbitrary and capricious" standard, a court must evaluate whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416. "The court may not substitute its own judgment for the agency's, and must only determine whether the agency's action does not violate the law, has a reasonable basis, and is supported by facts within the record." Leboeuf, Lamb, Greene & Macrae, LLP v. Abraham, 215 F. Supp. 2d 73, 83 (D.D.C. 2002).

**ANALYSIS**

This Court, in its August 9, 2004, Memorandum Opinion and Order, invited Voices to amend its pleadings to state a claim under the APA that OFAC's "failure to issue a penalty notice more promptly, or its decision to issue a penalty notice so immediately after Voices's protest activities" were arbitrary and capricious or contrary to law. Voices, 329 F. Supp. 2d at 80. Voices has now filed an amended answer and counterclaim that includes a defense under the APA that purports to "incorporate[] all violations of law and procedure referenced in the complaint and in the proceedings herein." Am. Answer & Countercl. at 8. Voices points in particular to three arguments it asserts under the APA: (i) that the near four-year delay between

the issuance of the pre-penalty notice and the final penalty notice is contrary to the governing regulations; (ii) that OFAC issued the penalty notice in retaliation for Voices' participation in the October 26, 2002 anti-war protest; and (iii) that OFAC's conduct is "not in accordance with domestic and international law, including those defining[] and prohibiting genocide." Id. at 8-9. The Court addresses these arguments in turn.

**I. The Claim of Unreasonable Delay**

In its earlier opinion in this case, this Court found that 31 C.F.R. § 575.704(b) -- which requires OFAC to "promptly" issue a written notice of monetary penalty to an offending party once "the Director determines that there was a violation" -- did not deprive OFAC of jurisdiction to enforce the monetary penalty even if OFAC delayed unreasonably in issuing a notice of monetary penalty. This Court explained that under the Supreme Court's decision in Brock v. Pierce County, 476 U.S. 253, 262-63 (1986), an agency did not lose jurisdiction for failing to comply with a statutory deadline unless the statute expressly requires the agency to act within a particular time period, and specifies consequences for failing to act in time. Because section 575.704(b) did neither, this Court concluded that noncompliance with the regulation did not strip OFAC of jurisdiction to act. See Voices, 329 F. Supp. 2d at 74.

This Court nononetheless noted that Brock had held open in a footnote the possibility that a party could state a cause of action under the APA challenging an unreasonable delay in agency action.[3] Relying on this footnote in Brock, the Court granted Voices leave to amend its

[3] The relevant footnote in Brock states:

> The Administrative Procedure Act . . . entitles any person 'adversely affected or aggrieved by agency action' to judicial review unless the relevant statute precludes judicial review or 'agency action is committed to agency discretion by law.' . . .

pleadings to more clearly articulate a claim that OFAC's "failure to issue a penalty notice more promptly, or its decision to issue a penalty notice so immediately after Voices's protest activities, violated the APA." Voices, 329 F. Supp. 2d at 80. The Court also ordered OFAC to provide a narrative of its decision to issue a monetary penalty and (later) to submit the full documentary record of its action in this case. Id. at 79-80.

Voices now makes the same argument that it advanced in its first set of papers: that the Secretary did not act "promptly" within the meaning of section 575.704(b) because he waited almost four years after the issuance of the pre-penalty notice and hence the final notice contravenes section 575.704(b). However, the Court does not believe that Brock intended that a party that was unable to invalidate an enforcement action *on jurisdictional grounds* because the governing regulation did not bind the agency to act within a specified period could turn around and invalidate an enforcement action *under the APA* using precisely the same argument. In fact, Brock does not appear to contemplate that a party can bring a claim to invalidate an enforcement action for unreasonable delay at all under the APA. The opinion suggests only that a party might seek "the less drastic remedy," which it describes as a claim to "compel" an enforcement action

---

> [I]t would appear that a complainant adversely affected by [an agency's] failure to act on a complaint could bring an action in the district court. The court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed.' If respondent is correct in arguing that Congress, in enacting [the governing statute], intended to protect grant recipients from lengthy delays in audits, grant recipients such as respondent would be within the zone of interests protected by [the statute], and would therefore have standing to bring an action under the APA to the same extent as a complainant. On the other hand, were [the statute] intended only to protect complainants, there would be no need to provide grant recipients with any remedy at all -- much less the drastic remedy respondent seeks in this case -- for the Secretary's failure to meet the 120-day deadline.

Brock, 476 U.S. at 260 n.7 (citation omitted).

"unlawfully withheld or unreasonably delayed." Brock, 476 U.S. at 260 n.7.

The distinction reflected in the Brock footnote is that between a section 706(1) claim to compel agency action unreasonably delayed, and a section 706(2)(A) claim to set aside agency action as arbitrary and capricious or contrary to law. The prevailing rule is that a claim that an agency has failed to comply with a statutory or regulatory deadline can give rise to an action to compel the agency to act under section 706(1), but usually cannot support a claim to set aside the agency action under section 706(2)(A).[4] The Brock footnote is in accord with this rule. Particularly in the circumstances of this case -- where the identical deadline argument was deemed unavailable under the holding of Brock -- plaintiff will have to show something more than merely that the agency failed to meet a statutory or regulatory deadline if it wishes to set aside OFAC's final penalty notice and this enforcement action under section 706(2)(A). One possibility is that it can show that the timing of the agency action was also motivated by an intent to retaliate or other bad faith, an issue to which the Court turns in a moment. See Iceland Steamship Co. v. United States Dep't of the Army, 201 F.3d 451, 461 (D.C. Cir. 2000) (agency action motivated by subjective bad faith is "arbitrary and capricious" under section 706(2)(A)).

Even if a claim to block the enforcement action on the lone ground of unreasonable delay

---

[4] See, e.g., Cal-Almond, Inc. v. U.S. Dept. of Agriculture, 14 F.3d 429, 444 (9th Cir. 1993) ("[A]ppellants have cited no cases, and we have found none, holding that an agency's delay in issuing a rule makes the rule itself arbitrary or capricious. Therefore, although the delay was certainly unfortunate and should be avoided in the future, it was not arbitrary or capricious."); Breyer v. Meissner, 23 F. Supp. 2d 540, 548 (E.D. Pa. 1998) ("While administrative agencies 'are often guilty of unconscionable delay,' the tools available to courts for remedying such delay are weak and limited, even 'against egregious, prejudicial, unjustifiable administrative foot-dragging.' An action could have been brought under the Mandamus and Venue Act, 28 U.S.C. § 1361, or under the APA, which allows a court to compel 'agency action unlawfully withheld or unreasonably delayed.'" (quoting Maxon Marine, Inc. v. Director, Office of Workers' Compensation Programs, 39 F.3d 144, 147 (7th Cir. 1994)).

were available to Voices, the evidence in the record demonstrates that the Agency's conduct in this case was not arbitrary and capricious (or otherwise contrary to law) under section 706(2)(A). The relevant regulation is clear: Only when, "after considering any presentations made in response to the prepenalty notice, the Director determines that there was a violation by the person named in the prepenalty notice" shall the Director "promptly" issue a written notice of the monetary penalty to that person. 31 C.F.R. § 575.704. This portion of the regulation is explicit that the determination whether a violation has occurred comes only "after considering any presentations made in response to the prepenalty notice." Id. The Director of OFAC has declared under oath that the Agency only completed its internal review of Voices' penalty action on November 4, 2002, and that he approved and signed the violation notice the same day. Newcomb Decl. at 11-14. The declaration explains that the agency's consideration of this case was delayed by other enforcement priorities, particularly in the wake of the September 11, 2001 terrorist strikes,[5] and that one of the principal reasons that OFAC issued the penalty notice when it did was the approaching end of the five-year statute of limitations. Voices does not offer any

[5] The declaration explains that a confluence of external events increased OFAC's workload substantially during the period between issuance of Voices' prepenalty (December 3, 1998) and final penalty (November 4, 2002) notices, including: (i) the increased focus on enforcement of Cuba sanctions announced by the President in July 2001, which resulted in the issuance of 649 prepenalty notices in the ensuing five months, Newcomb Decl. at 13; (ii) the terrorist attacks of September 11, 2001, and the resulting reallocation of nearly all of OFAC's resources to responding to the attacks, id.; and (iii) a substantial FOIA litigation from December 2001 through August 2002, and a revision by the Civil Penalties staff of OFAC's internal enforcement guidelines, which ran from April to July of 2002. These external events resulted in the Civil Penalties Division's caseload increasing 172% (from 1,082 to 2,943) between 1998 and 2002. Id. at 7. Although Division staffing during this time period doubled, average caseload per employee still rose 36% (from 541 to 735.8). Id.

evidence to dispute these sworn statements. Whatever may be the bounds of the term "promptly," this Court cannot say that issuing a penalty notice on the same day that the internal review was submitted to the Director for a final determination is anything other than prompt.

Because OFAC complied with the promptness requirement in issuing Voices' penalty notice following the Director's determination that a violation had occurred, Voices' APA defense on this ground is rejected. To establish that OFAC's conduct was arbitrary and capricious under section 706(2)(A) of the APA, then, Voices must show that OFAC issued the penalty with an improper motive. It is to that argument that the Court now turns.

**II. The Alleged Unlawful Motive**

Voices claims that OFAC's conduct was arbitrary and capricious under the APA because the Agency acted in retaliation against Voices for its participation in the October 2002 anti-war protests. Voices raised these allegations in its initial pleadings in the form of defenses and counterclaims based on "malicious, selective and discriminatory prosecution." In its August 9, 2004, Memorandum Opinion, the Court rejected these defenses and dismissed these counterclaims. Voices, 329 F. Supp. 2d at 83. The malicious prosecution claim failed because such a claim can only be raised "after termination of court proceedings in favor of the defendant." Id. The Court rejected Voices' selective prosecution argument because Voices was unable to make a colorable claim that it was "singled out for prosecution from among others similarly situated, and that [the] prosecution was improperly motivated." Id. The Court noted that both allegations rested entirely on the delay in issuing the final penalty notice and the fortuitous timing of that notice in relation to Voices' anti-war protest, and that the law was clear that "sequence of events is not alone sufficient to raise an appearance of vindictive prosecution" in the pre-trial

setting. Id. at 83-84.

Pursuant to this Court's direction, OFAC has now produced a declaration from the Agency's former Director and a full documentary record of the relevant proceedings. Voices has not identified – and this Court cannot find – any additional evidence of an unlawful motive in these materials that would support a malicious or selective prosecution claim or, more generally, a claim under the APA that OFAC acted in an arbitrary and capricious manner by seeking to punish Voices' protest activity. As noted earlier, the delay in the agency's conduct can be explained by the reordering of OFAC's enforcement priorities pursuant to the President's orders, particularly in the wake of September 11, 2001. Furthermore, the Director avers that in light of the five-year statute of limitations in 28 U.S.C. § 2462 and the November 21, 1997 trip to Iraq by two of Voices' members, the Agency viewed November 21, 2002 as the date by which final penalty notices in this matter had to be issued. Newcomb Decl. at 14. The Director is emphatic that Voices' participation in the October 2002 protest "played no part in the issuance of a Penalty Notice," id. at 14, and there is no evidence in the administrative record or other documents to rebut that assertion.

Unable to point to anything other than fortuitous timing to support its claim of bias,[6] Voices is left to ask the Court for discovery to attempt to uncover definitive evidence of

[6] At the July 6, 2005 hearing, Voices called the Court's attention to recent Senate hearings where, defendant claims, it was revealed that oil companies involved in the U.N.'s Oil for Food program had violated the regulations without being fined. However, simple failure by OFAC to fine a violator does not bolster either prong of the case Voices must make to advance a selective prosecution claim; the oil companies, for various reasons including their involvement in the U.N. program, are not similarly situated to Voices, and OFAC's failure to fine them does not affirmatively establish any improper motive for the Agency's fine of Voices. Accordingly, the Court's prior ruling stands unchanged: Voices has failed to establish a colorable selective prosecution claim.

wrongdoing. Def. Opp. at 3. However, the D.C. Circuit has made it clear that discovery is permitted in APA cases only "when there has been 'a strong showing of bad faith or improper behavior' or when the record is so bare that it prevents effective judicial review." Commercial Drapery Contractors v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998). Were the rule otherwise, every challenge to administrative action would turn into a fishing expedition into the motives of the defendant agency. As noted above, Voices has not made a strong showing that OFAC acted improperly or in bad faith. And far from the "bare" record contemplated by Commercial Drapery, the record here now contains a 15-page declaration from the Director of OFAC and a 214-page administrative record. Accordingly, Voices' request for discovery is rejected, and the Court's review is appropriately limited, as is customary, to the administrative record and additional materials which the Court has ordered the Agency to produce.

**III. International Law Arguments**

Finally, Voices renews its arguments arising out of international human rights law, claiming that OFAC's enforcement action violates the APA because it is at odds with domestic and international laws "defining[ ] and prohibiting genocide and complicity with genocide." Def.'s Am. Answer & Countercl. at 8-9. This Court has already rejected the argument that OFAC's actions violated domestic and international law, and Voices has presented no new evidence of such a violation. See Voices, 329 F. Supp. 2d at 81-82. Accordingly, Voices' APA defense on the grounds that OFAC's actions violated domestic and international law is rejected for the reasons stated in the Court's earlier decision.

## CONCLUSION

Voices has not met its burden of demonstrating that OFAC's actions violated the APA. Although the Court respects the conviction of Voices and its members in challenging what they regard as immoral government policies, the record demonstrates that defendant is being fined not for its views, but for the willful and knowing violation of statutes, executive orders and regulations enacted by elected political representatives. The same system of laws that protects Voices' right to peacefully protest government policies and petition for their change also demands that Voices submit to the penalties that attach under law when it chooses to violate those policies. "One who breaks an unjust law must do so openly, lovingly, and with a willingness to accept the penalty." Rev. Martin Luther King, Letter from Birmingham Jail (Apr. 16, 1963). Because Voices has presented no credible evidence that OFAC's civil enforcement action was anything other than lawful, it must bear the burden of the monetary fine as a cost of protesting administration and U.N. policies in the manner it chose to employ.

OFAC's motion for judgment on the pleadings is therefore granted. A separate order has been issued on this date.

/s/ John D. Bates
JOHN D. BATES
United States District Judge

Dated: August 12, 2005

Copies to:

Sara Wood Clash-Drexler
US DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
20 Massachusetts Avenue, NW
P.O. Box 883
Washington, DC 20044
(202) 514-3481
Fax : (202) 616-8460
Email: sara.clash-drexler@usdoj.gov

William P. Quigley
LOYOLA UNIVERSITY NEW ORLEANS SCHOOL OF LAW
7214 St. Charles Avenue
Room 118
New Orleans, LA 70118
(504) 861-5590
Fax : (504) 861-5440
Email: quigley@loyno.edu

Carl L. Messineo
Mara E. Verheyden-Hilliard
PARTNERSHIP FOR CIVIL JUSTICE
1901 Pennsylvania Avenue NW
Suite 607
Washington, DC 20006
(202) 530-5630
Fax : (202) 530-5634
Email: pcj@JusticeOnline.org